**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | **FILED UNDER SEAL** |
| v. | |
| CAMERON REDMAN, | Criminal No. 1:24-MJ-155 |
| *Defendant*. | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Jordan A. Jenkins, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    Your affiant is a law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been employed as a special agent with the Federal Bureau of Investigation (hereafter "FBI") since 2021. I am currently assigned to the FBI's Washington Field Office's securities fraud squad, which has investigative responsibility for complex financial crimes. I have participated in investigations involving securities fraud, investment fraud, money laundering, and cybercrime. I have training and experience in the enforcement of the laws of the United States, including in the preparation and presentation of search warrant affidavits and the execution of search warrants, as well as extensive training in investigating white-collar crimes. I have received the Chainalysis Ethereum Investigations and Certified Anti-Money Laundering certifications, and training in the tracing of funds generated from illicit activity, including cryptocurrencies, through the international banking system and blockchain technologies.

2.    I make this affidavit in support of a criminal complaint charging CAMERON ALBERT REDMAN (hereafter "REDMAN") with: two counts of conspiracy to commit wire

1

fraud, in violation of 18 U.S.C. § 1349; one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2; and one count of conspiracy to commit aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 371.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is being submitted for the limited purpose to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all my knowledge about this investigation. I have set forth facts that I believe are sufficient to charge REDMAN with the criminal conduct set forth herein. The legal authorities cited herein have been provided based on review of this affidavit and follow-on discussions with the Assistant United States Attorneys assigned to the case.

## RELEVANT STATUTORY PROVISIONS

4.      **Wire Fraud**: Title 18, United States Code, Section 1343 provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

5.      **Conspiracy to Commit Wire Fraud**: Title 18, United States Code, Section 1349 provides in pertinent part: Any person who attempts or conspires to commit wire fraud shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

6.    **Aggravated Identity Theft**: Title 18, United States Code, Section 1028A(a)(1) provides in pertinent part: Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years. Among others, Section 1028A(c) defines enumerated felony offenses to include "(5) any provision contained in chapter 63 (relating to mail, bank, and wire fraud)."

7.    **Conspiracy**: Title 18, United States Code, Section 371 provides in pertinent part: If two or more persons conspire to commit any offense against the United States, each shall be fined under this title or imprisoned not more than five years, or both.

8.    **Means of Identification**: The term "means of identification" is defined in Title 18, United States Code, Section 1028(d)(7) to mean, in pertinent part, any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual.

## CRYPTOCURRENCY BACKGROUND

9.    **Virtual Currency**: Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies operate on different blockchains, and there are many different widely used virtual currencies currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use.

10.    **Ethereum**: Ethereum is a blockchain platform that supports cryptocurrencies, smart contracts, and the development of decentralized finance applications. Ether ("ETH") is the native token on the Ethereum blockchain. The Ethereum blockchain runs on a network of Ethereum nodes. An Ethereum node is a computer connected to the Ethereum network that keeps

3

record of all transactions made on Ethereum and maintains a complete copy of the Ethereum blockchain. Each Ethereum node communicates with other Ethereum nodes to ensure all respective copies of the blockchain are accurate and up-to-date. The communication enables Ethereum nodes to reach consensus on the final, accurate records and ensure all transactions validated on the blockchain are within the rules defined by the Ethereum network. Anytime the Ethereum blockchain is utilized and a new block is added to the blockchain, every single node on the Ethereum network must process the transaction.

11.     **Virtual Currency Address**: Virtual currency addresses are the particular virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number is represented as a string of letters and numbers.

12.     **Virtual Currency Wallet**: There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

13.     Wallets that are hosted by third parties are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

14.     **Hardware Wallets**: Hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[1] with the public and private key embedded in the code. Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper

---

[1] A QR code is a matrix barcode that is a machine-readable optical label.

printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

15.    **Blockchain**: Many virtual currencies publicly record all of their transactions on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address.

16.    **Blockchain Explorer:** These explorers are online tools that operate as a blockchain search engine allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses API[2] and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format.

17.    **Smart Contracts:** Smart contracts are computer programs stored on a blockchain that run when predetermined conditions are met. Typically, they are used to automate the execution of an agreement so that all participants can be immediately certain of the outcome,

---

[2] API stands for application programming interface, which is a set of definitions and protocols for building and integrating application software.

without any intermediary's involvement. The Ethereum network is designed and functions based on smart contracts.

18.     **Virtual Currency Exchanges (VCEs):** VCEs are trading and/or storage platforms for virtual currencies, such as BTC and ETH. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously states, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

19.     **Virtual Currency Mixers:** Virtual currency mixers (also known as tumblers or mixing services) are software services that allow users, for a fee, to send virtual currency to designated recipients in a manner designed to conceal and obfuscate the source of the virtual currency.

20.     **Blockchain Analysis:** As previously stated, while the identity of the virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (e.g., the BTC blockchain or Ethereum blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. For example, when an organization creates multiple addresses, it will often combine these addresses into a separate, central address (i.e., a "cluster"). It is possible to identify a 'cluster' of addresses held by one organization by analyzing the blockchain's transaction history using open-source tools and/or private software.

21.     In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt

to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

22.    **Non-fungible tokens (NFTs):** NFTs are cryptographic assets on a blockchain that contain unique identification codes and metadata enabling one NFT to be distinguished from another. The blockchain is used to certify an NFT's authenticity and ownership.  The ownership of an NFT can be transferred, allowing NFTs to be sold and traded. NFTs can be stored in the same wallets used to store cryptocurrency.

23.    **SIM Swap Scam**: A SIM swap scam is a type of account takeover fraud that generally targets a weakness in two-factor authentication and two-step verification in which the second factor or step is a text message or call placed to a mobile telephone.

24.    **Phishing**: Phishing is a social engineering attack often used to steal data and assets such as login credentials, credit card numbers, and digital currency. It occurs when a threat actor, masquerading as a trusted entity, dupes a victim into opening a message, email or website and then clicking on a malicious link. The link can provide the threat actor access to the victim's data and assets.

<u>**FACTS AND CIRCUMSTANCES**</u>

25.    Through my participation in this investigation, including conversations with victims and witnesses, I have learned the following facts.

**I.    BACKGROUND OF INVESTIGATION**

26.    On or about November 17, 2021, CAMERON ALBERT REDMAN ("REDMAN") was arrested in Hamilton, Ontario for theft over $5,000.00 and possession of property or proceeds of property obtained by crime. Specifically, REDMAN executed a SIM swap attack and theft of approximately $46 million CAD (Canadian Dollar) worth of cryptocurrency from a United States based victim. REDMAN pleaded guilty to one count of

Theft Over $5,000 and was given time served for the year he spent in jail. Further, REDMAN was banned from handling digital assets for one year.

27.     In or around September 2022, the FBI was alerted to a criminal scheme through which REDMAN and several individuals compromised X Corp ("X") (formerly Twitter) accounts and executed phishing scams resulting in the theft of NFTs and digital assets. REDMAN and various coconspirators gained unauthorized access to X accounts using an X customer service panel called the Partner Support Panel ("PSP"). He and his coconspirators then used that access to post messages containing malicious phishing links to fraudulent websites designed to drain NFTs and digital assets. The messages posted by REDMAN and his coconspirators to the compromised X accounts were crafted to appear like they were posted by the actual owners of the compromised accounts and advertised giveaways or opportunities to "mint" new NFTs by clicking a link. [3] When clicked, the phishing links directed victims to a fake website. The fake websites were designed to appear nearly identical to the official websites associated with the compromised X accounts. The fake website domains, purchased from various domain registrars, were designed to follow naming conventions nearly identical to the official website domains. On the fake websites, victims were directed to connect their cryptocurrency wallets and approve a transaction to receive the digital asset advertised in the unauthorized posts; however, no digital asset was ever received by the victim.  Instead, the approved transaction actually facilitated the transfer of victims' cryptocurrency and/or NFTs from their cryptocurrency wallets to a wallet controlled by the perpetrators. The stolen NFTs were subsequently sold on secondary NFT markets such as OpenSea, and the profits for the sale were

---

[3] Minting is the process of publishing an NFT on the blockchain that establishes an immutable record of authenticity and ownership.

distributed among the conspirators, including REDMAN.[4] These and other actions, discussed in additional detail in the rest of this affidavit, provide probable cause to believe that REDMAN has committed the following offenses:

28.    **Count 1: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349)**. On or about May 22, 2022, REDMAN gained access to Victim 1's X account using the PSP. He then worked with COCONSPIRATOR ("CC") 2, CC-3, and others known and unknown to law enforcement to use that access to post messages containing malicious phishing links to fraudulent websites designed to drain NFTs and digital assets. The facts supporting this charge are discussed in additional detail in paragraphs 38 through 49.

29.    **Count 2: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349)**. REDMAN also sold his method for compromising X accounts through the PSP to CC-1. From on or about June 26, 2022, to on or about July 19, 2022, REDMAN, CC-1, CC-4, CC-5, CC-6, and other conspirators known and unknown to law enforcement then engaged in a criminal scheme to gain unauthorized access to X accounts, including accounts belonging to Victim 2, Victim 3, Victim 4, and Victim 5, and post messages containing malicious phishing links to fraudulent websites designed to drain NFTs and digital assets. The compromised X accounts belonged to major cryptocurrency and NFT projects, artists, and influencers that maintained a significant number of followers on X. The facts supporting this charge are discussed in additional detail in paragraphs 54 through 89.

30.    **Count 3: Wire Fraud (18 U.S.C. §§ 1343, 2)**. On or about July 14, 2022, REDMAN sent messages to X through the PSP as part of the effort to gain access to Victim 2's X account. Once inside the account, REDMAN and others posted messages containing malicious

---

[4] OpenSea is an NFT marketplace allowing for NFTs to be sold directly at a fixed price, or through an auction.

phishing links to fraudulent websites designed to drain NFTs and digital assets. The facts supporting this charge are discussed in additional detail in paragraphs 54 through 89, while the specific wire charged in this count is described in paragraph 72.

31.     **Count 4: Aggravated Identity Theft (18 U.S.C. §§ 1028A(a)(1), 2)**. On or about May 22, 2022, REDMAN used, without lawful authority, the means of identification of Victim 1 in furtherance of a violation of 18 U.S.C. §§ 1343 and 1349. The facts supporting this charge are discussed in additional detail in paragraphs 38 through 49.

32.     **Count 5: Conspiracy to Commit Aggravated Identity Theft (18 U.S.C. §§ 1028A(a)(1), 371)**. From on or about July 14, 2022, to on or about July 19, 2022, REDMAN, CC-1, CC-4, CC-5, and others conspired to use, without lawful authority, the means of identification of Victim 2 and Victim 3 in furtherance of a violation of 18 U.S.C. §§ 1343 and 1349. The facts supporting this charge are discussed in additional detail in paragraphs 54 through 89.

33.     At all times relevant herein and unless otherwise noted, REDMAN was located in Canada; CC-1 and CC-2 were located within the United States; CC-3, CC-4, and CC-5 were located outside the United States; and CC-6's location is unknown. Victim 1 is located within the United States, while Victim 2 and Victim 3 are non-U.S. citizens believed to be located outside of the United States.

34.     On or about December 5, 2023, CC-1 signed a cooperation agreement with the United States government. In a previous interview with law enforcement on September 8, 2022, CC-1 denied his involvement in a fraud scheme to compromise social media accounts and execute phishing schemes. However, in interviews with FBI on July 27, 2023, and December 12, 2023, CC-1 admitted to and disclosed their role in multiple fraud schemes, turned over fraud proceeds, and provided information about other individuals.

10

35.    On or about January 25, 2024, an Information was filed in another district charging CC-1 with four counts of conduct constituting juvenile delinquency, which had CC-1 been an adult at the time of the conduct, would have been violations of 18 U.S.C. § 1343 (wire fraud). CC-1 pleaded guilty to the counts of conduct in the Information.

36.    Since CC-1 signed the cooperation agreement, FBI received information from a highly credible confidential human source stating CC-1 is currently involved in various fraud schemes, which would be a violation of CC-1's agreement with the United States and his conditions of pre-trial supervision. However, FBI has not been able to independently verify this information. Additionally, CC-1 has been on electronic device monitoring as part of his conditions of pre-trial supervision, and no violations of his conditions of release have been detected or identified. Since CC-1 began cooperating with law enforcement, CC-1 has provided fulsome information, and law enforcement has been able to independently verify and corroborate that information. Based on these facts, I believe the information provided by CC-1 during interviews with FBI on July 27, 2023 and December 12, 2023 is credible.

37.    CC-2 is likewise cooperating with the FBI pursuant to a signed and executed proffer and immunity agreement with the United States government. After signing and executing a proffer and immunity agreement in March 2023, CC-2 violated the agreement by committing additional criminal activity. Under questioning, CC-2 disclosed the activity, turned over criminal proceeds from this intervening criminal activity to the FBI, and subsequently signed a second Letter of Immunity in or around May 2023. Since signing and executing the second Letter of Immunity, CC-2 has not violated any terms of the agreement and CC-2 has fully cooperated with the FBI. During this investigation, law enforcement has been able to independently verify and corroborate information provided by CC-2. Based on these facts, I believe the information provided by CC-2 since signing the second immunity letter is credible.

## II.    COMPROMISE OF VICTIM 1 X ACCOUNT (Counts 1 and 4)

38.    Victim 1 is a well-known NFT artist. Victim 1 uses an online moniker to advertise his work that is closely associated with his name; for example, Victim 1's website explicitly states on the homepage that "[moniker] is [Victim 1]". Victim 1's username on his X account is this moniker. Victim 1's X account includes a link to his website. Victim 1 uses his X account to share his work and communicate with his followers. His posts occasionally include images and videos of himself in addition to his artwork. Victim 1's X account followers believe that posts on that account are made by Victim 1 and represent his work unless a post explicitly indicates otherwise.

39.    On May 22, 2022, CC-2, REDMAN, and conspirators compromised Victim 1's X Account. According to CC-2 and records provided by X, REDMAN submitted a support ticket through X's PSP claiming to be an authorized user of the X account and successfully gained control of the account.

40.    Records provided by X reveal that X's PSP was an internal X system primarily used by X employees to submit service tickets for particularly large or important customers experiencing technological issues, including requests to reset passwords for X accounts. The PSP was also intended to allow certain external entities, typically entities associated with large or important customers, the ability to directly submit cases to X customer service for expedited assistance with issues such as username changes or access requests directly. These entities were granted a special role that enables access to a special Help Center form. When submitted, this form created Service Cloud tickets that X customer service employees treat as "vouched," meaning equivalent to having been approved and escalated by an X employee with personal knowledge of the escalated account owner for which they are vouching.

12

41.    X also provided records revealing external actors exploited a vulnerability enabling them to access X's PSP and submit service tickets to reset passwords and subsequently access accounts without authorization. The records from X also confirmed that multiple X accounts were compromised and unauthorized posts with phishing links were published to the accounts.

42.    After REDMAN had gained access to Victim 1's account, he and a coconspirator posted a link to a fraudulent website that advertised a "raffle"—for one ETH, an individual could buy a "ticket" to that raffle. When victims visited the website, however, they authorized REDMAN and his coconspirators to drain all of the ETH in their wallets.

43.    CC-3 soon reached out to CC-2 and asked if he would assist REDMAN with the attack on Victim 1's account. When CC-2 expressed interest, CC-3 created a group chat that included REDMAN, CC-2, and CC-3. CC-2 learned that REDMAN had compromised Victim 1's account, and another coconspirator had created a fraudulent website that would steal victim's Ether. CC-2 indicated that he had a better drainer that would steal NFTs. The coconspirators understood that CC-2's role would be to create a new website to steal NFTs that looked like Victim 1's legitimate website, and they discussed CC-2's fees. CC-2 built this website, using Victim 1's real website as a model. REDMAN provided CC-2 with the log-in information to Victim 1's account, where CC-2 created a post linking to his NFT-stealing website.

44.    The first post below depicts the post to Victim 1's X account that REDMAN and his coconspirators initially made, while the second post depicts CC-2's post:





45.    The phishing links included in these posts directed individuals to websites that were different than Victim 1's actual website.

46.    Law enforcement obtained publicly available archived copies of the fraudulent website created by CC-2 and Victim 1's official website from May 22, 2022.[5] The archived copies of the official website and fraud website are depicted below:

---

[5] The Wayback Machine automatically crawls and captures snapshots of webpages at various points in time. There are no available captured snapshots from the initial fraudulent website that REDMAN and his coconspirators posted.

15

*Victim 1 Official Website*



*Victim 1 Fraud Website*



47.     According to victims and CC-2, once an individual interacted with either of the two fraudulent websites, a pop-up appeared asking the individual to connect their cryptocurrency wallet and approve a transaction. Victims believed they were approving a transaction to receive NFTs, but in fact they were authorizing withdrawals from their wallets. Once the cryptocurrency

16

wallet was connected, cryptocurrency or NFTs were transferred from the victims' wallets to cryptocurrency wallets operated by the perpetrators.

48.    On May 22, 2022, the Victim 1 X Account published a post indicating the account was hacked but that Victim 1 had regained control. Multiple victims replied to the post indicating that their NFTs were stolen after interacting with the websites included in the unauthorized posts. A redacted copy of the post is depicted below:



49.    CC-2 controlled the Ethereum addresses that received NFTs from the website he designed. Though he was supposed to receive the NFTs, sell them, and share the proceeds of the fraud with CC-3 and REDMAN, CC-2 never sent any money to REDMAN. In total, the sale of NFTs stolen from victims of the Victim 1 X Account compromise and phishing scam totals approximately $446,756.92 USD.

### III.    SALE OF ACCESS TO X ACCOUNTS TO CC-1

50.    In and around June 2022, CC-1 sought access to X accounts in order to execute phishing scams to steal NFTs. CC-1 was introduced to REDMAN on the encrypted communications platform Telegram, through a mutual friend who vouched for REDMAN's ability to gain access to X accounts. On Telegram, REDMAN used the username "@suicidal". During their communication, REDMAN revealed his identity to CC-1 and bragged about a SIM swap attack for which he was previously arrested. REDMAN told CC-1 he still has approximately $15 million USD in proceeds from the 2021 SIM swap attack. On occasion, CC-1 and REDMAN communicated via voice calls and voice notes. REDMAN sent CC-1 photographs and videos of himself.

51.    Starting in or around June 2022, for approximately one week, CC-1 and REDMAN specifically communicated about REDMAN's unlawful access to X's PSP, his ability to take over X usernames, and prices for purchasing REDMAN's access to the PSP.

52.    During this negotiation and discussion period, CC-1 told REDMAN about CC-1's and their other co-conspirators' intent to use the PSP to compromise NFT and cryptocurrency related X accounts for the purpose of executing phishing scams on victims who likely owned highly valued NFTs. After a series of negotiations between CC-1 and REDMAN, REDMAN agreed to sell CC-1 exclusive access to the PSP (i.e., REDMAN would not sell it to others) for however long the access continued to work. REDMAN and CC-1 negotiated that CC-1 would pay approximately 230 ETH and a 10 percent cut of the profits from all phishing scams. CC-1 confirmed that he did purchase access to the PSP from REDMAN, and blockchain analysis confirms that he transferred 230 ETH on or about June 27, 2022, which was valued at approximately $283,411 USD at the time of the purchase.

18

53.    Upon completion of the deal, REDMAN taught CC-1 how to compromise X accounts through the PSP. Specifically, REDMAN instructed CC-1 to look up top media agencies, identify their website domains, buy a similar website domain from a domain hosting service such as Namecheap or Porkbun,[6] and create an imposter email address that appeared to be from the agency. Next, REDMAN sent CC-1 a link to the PSP and explained that the link must be accessed using a specified virtual private network ("VPN")[7] in order to work. REDMAN then showed CC-1 how to submit a request through the PSP to change the email account associated with the targeted X account to the imposter email created by CC-1. REDMAN provided CC-1 a template message to be used when submitting the request through the PSP. If the process worked according to plan, X would change the email address of the targeted account to the imposter email address controlled by CC-1. REDMAN instructed CC-1 to submit one request per day through the PSP and to use a different IP address for each request.

## IV.    X COMPROMISES INVOLVING CC-1 (Counts 2, 3, and 5)

### a.    Victim 4

54.    Victim 4 is a decentralized autonomous organization and creator of an NFT project. Victim 4 uses its X account to advertise its NFTs and communicate with its followers.

55.    On or about June 26, 2022, REDMAN, CC-1, and other coconspirators compromised Victim 4's X Account. According to CC-1, REDMAN identified Victim 4 as the target of the compromise and then provided the other coconspirators with guidance on how to use the PSP to gain control of Victim 4's X account. Following REDMAN's instructions, CC-4

---

[6] Namecheap and Porkbun are domain registrar and webhosting services.

[7] Virtual private networks (VPN) establish a connection between your computer and a remote server owner by a VPN provider, creating a point-to-point tunnel that encrypts your personal data and masks your IP address.

created an email address designed to impersonate a media agency and then used the email

address to send requests through X's PSP. The email, using a script provided by REDMAN,

requested a password reset of the Victim 4 X Account. A coconspirator reset the password,

logged onto the Victim 4 X account, and turned off comments on the account. In my training and

experience, I know criminals turn off comments on compromised X accounts so victims will not

be able to post or see any comments alerting them to the fraudulent activity.

56.     Once in control of the Victim 4 X account, CC-5 created a website designed to

impersonate Victim 4's website and developed a manual drainer smart contract used to drain

NFTs from victims.[8] According to CC-1, a manual drainer requires malicious actors to manually

set approvals and enter a destination cryptocurrency address in order to actually gain possession

of the NFTs each time a victim engages with the smart contract and authorizes a transaction.

57.     When the website was ready, CC-1 published a post to Victim 4's X account

containing a phishing link advertising a new "pass" and the opportunity to claim NFTs from a

website. An archived and redacted copy of the unauthorized post is depicted below, though the

fraudulent link is not depicted:

---

[8] Another coconspirator had earlier created a website that used an automatic drainer, but it did
not work properly.



58.    The phishing link directed individuals to a fraudulent website with a domain name that closely resembled both the real website and Victim 4's name.

59.    Law enforcement obtained publicly available archived copies of the fraudulent website from June 27, 2022, and Victim 4's real website from June 5, 2022.[9] A review of the archived websites shows the fraudulent website looked similar to the real website, though the fraudulent website utilized a different font and included a button labeled "Enter Raffle" related to the scam posted on the X account. The archived copies of the official and fraudulent websites are depicted below:

---

[9] The Wayback Machine automatically crawls and captures snapshots of webpages at various points in time. There are no available captured snapshots from the official Victim 4 website on the day of the compromise. As such, a screenshot of the next closest capture on June 5, 2022, is included for reference.

*Victim 4 Official Website*



*Victim 4 Fraud Website*



60.     According to CC-1, once an individual clicked the "Enter raffle" button on the fraudulent website, a pop-up appeared asking the individual to connect their cryptocurrency wallet and approve a transaction. Once the cryptocurrency wallet was connected, CC-1 and his coconspirators could then manually approve the transfer of NFTs and digital assets from the victims' wallets to a cryptocurrency wallet operated by CC-1.

61.     On or about June 27, 2022, the Victim 4 X account published a post indicating that control of the account was regained following the compromise. Multiple victims replied to this post indicating that their NFTs were stolen after interacting with the link.

62.     After receiving NFTs from victims' wallets, CC-1 quickly sold them for ETH before they could be reported stolen. CC-1 then transferred that ETH to the other coconspirators, including REDMAN. In total, the sale of NFTs stolen from victims of the Victim 4 X account compromise and phishing scam totals approximately $24,210.04 USD.

63.     According to CC-1, the Victim 4 X compromise was the first time CC-1 successfully used REDMAN's access to the X PSP to compromise an X account. REDMAN made approximately $15,000 USD from the Victim 4 X Account compromise and phishing scam; some of this money represented his share of the profits from the scam, while some of it was the remainder of the payment that CC-1 owed REDMAN for the purchase of access to the PSP.

### b.  Victim 5

64.     Victim 5 is a membership NFT collection, which means that owners of Victim 5's NFTs are granted access to exclusive perks including Victim 5 events, content, and early access to partner projects. Victim 5 uses its X account to advertise its NFTs and communicate with its followers.

65.     On or around June 28, 2022, REDMAN, CC-1, and other coconspirators compromised Victim 5's X account. According to CC-1 and records provided by X, REDMAN helped select the victim and the media company that the coconspirators would impersonate and again guided CC-4 through using the PSP to gain control of the victim's X account.[10] After Victim 5's X account password was successfully reset, CC-6 created a website designed to impersonate Victim 5's website and developed an auto-drainer smart contract used to drain NFTs from victims who interacted with the fake website.

66.     CC-1 published a post to the account advertising a "Stardust Membership Pass" for free.[11] This post contained a link to the fraudulent website. The domain for the fraudulent website closely mirrored Victim 5's real domain. An archived copy of the unauthorized post is depicted below:

---

[10] CC-1 has variously said that REDMAN sent the emails to X for this compromise, and that he only provided guidance on sending the emails.

[11] A membership pass is a collection of membership NFTs. Holding one grants owners exclusive access to various Victim 5 benefits.



67.    Law enforcement obtained publicly available archived copies from June 28, 2022, of the fraud website and Victim 5's real website. A review of the archived websites shows the fraudulent website looked nearly identical to the real website but contained a button labeled "Claim Airdrop" instead of button labeled "OpenSea". The archived and redacted copies of the real and fraudulent websites are depicted below:



*Victim 5 Official Website*



*Victim 5 Fraud Website*



68.    According to CC-1, once a victim clicked the "Claim Airdrop" button on the fraudulent website, a pop-up appeared asking the victim to connect their cryptocurrency wallet and approve a transaction. Specifically, the victims thought they were authorizing the receipt of an NFT, but in reality, they authorized NFT and/or cryptocurrency to be withdrawn from their wallets. Once the victims' cryptocurrency wallet were connected, NFTs and digital assets were transferred from the victims' wallets to cryptocurrency wallets controlled by the perpetrators.

69.    On July 1, 2022, the Victim 5 X account published a post indicating that control of the account was regained following the compromise. Multiple victims replied to this post indicating that their NFTs were stolen after interacting with the link.

70.    According to CC-1, stolen NFTs were quickly sold on OpenSea or to a private seller for ETH. CC-1 then transferred those proceeds to the other coconspirators, including REDMAN. In total, the sale of NFTs stolen from victims of this compromise and phishing scam totals approximately $128,440.69 USD. CC-1 estimates REDMAN received approximately $40,000 USD from the Victim 5 X account compromise and phishing scam.

### c. Victim 2

71.     Victim 2 is digital artist and animator recognized as a top selling NFT artist. Victim 2 uses an online moniker, including on X, to advertise his work that incorporates his real name and is closely associated with his full name. Victim 2's X accounts links to his website through an intermediate link. Victim 2 uses his X account to share his work and communicate with his followers. Victim 2's X account followers believe that posts on that account are made by Victim 2 and represent his work unless a post explicitly states otherwise.

72.     On July 14, 2022, REDMAN, CC-1, CC-4, and CC-6 compromised Victim 2's X account. According to CC-1 and records provided by X, REDMAN created an email address designed to impersonate a media agency and then used the email address to send requests through X's PSP claiming to be an authorized representative of Victim 2. REDMAN's emails requested a password reset of Victim 2's X account. In order to convince X to allow the password reset, REDMAN sent an email to the PSP on or about July 14, 2022, in which he falsely represented the following:

> I am the authorized account holder of [Victim 2's X account]
> I originally authorized the creation and use of the account [Victim 2's X account]
> I have attempted and I am not able to access the account through standard processes
> I am requesting that the email associated with the account be changed to [redacted]

73.     After the coconspirators successfully received a password reset link, they reset the password and CC-1 gained access to the account. CC-6 created a website designed to impersonate Victim 2's website. The coconspirators deployed a smart contract used to drain NFTs from victims who interacted with the fake website.

74.     An archived and redacted copy of the unauthorized post to Victim 2's X account is depicted below:



75.    The phishing link directed individuals to a website with a domain using Victim 2's moniker, which was similar to the real domain of Victim 2's website.

76.    Law enforcement obtained publicly available archived copies of the fraudulent website July 15, 2022, and the official website from July 2, 2022.[12] A review of the archived websites shows the fraudulent website looked nearly identical to the real website but contained a button labeled "Claim Airdrop" at the top of the webpage. The archived and redacted copies of the real and fraudulent websites are depicted below:

---

[12] The Wayback Machine automatically crawls and captures snapshots of webpages at various points in time. There are no available captured snapshots from the Victim 2 Official Website on the day of the compromise. As such, a screenshot of the next closest capture on July 2, 2022, is included for reference.

*Victim 2 Official Website*



*Victim 2 Fraud Website*



77.     According to victims and CC-1, once an individual clicked the "Claim Airdrop" button on the fraudulent website, a pop-up appeared asking the individual to connect their cryptocurrency wallet and approve a transaction. Once the cryptocurrency wallet was connected, NFTs and digital assets were transferred from the victims' wallets to a cryptocurrency wallet operated by the perpetrators.

78.     On July 15, 2022, Victim 2's X account published a post indicating that control of the account was regained following the compromise. Multiple victims replied to this post indicating that their NFTs were stolen after interacting with the link.

79.     After receiving NFTs from victims' wallets, CC-1 quickly sold them for ETH before they could be reported stolen. CC-1 then transferred that ETH to the other coconspirators, including REDMAN. In total, the sale of NFTs stolen from victims of the Victim 2 X account compromise and phishing scam totals approximately $126,944.67 USD. According to CC-1, REDMAN received approximately $40,000 USD from this compromise and phishing scam. CC-1 paid REDMAN more than they initial agreed to because REDMAN extorted CC-1.

### d. Victim 3

80.     Victim 3 is an NFT influencer and founder of several NFT projects. Victim 2 uses an online moniker, including on X, to distribute his work. This moniker is closely and easily associated with his real name. Victim 3 uses his X account to share his work and projects and communicate with his followers. Victim 3's X account followers believe that posts on that account are made by Victim 3 unless a post explicitly states otherwise.

81.     On or around July 19, 2022, REDMAN, CC-1, and other coconspirators compromised Victim 3's X Account. According to CC-1, REDMAN helped select the media company, and he and CC-4 used the fake media company email addresses to communicate with

X through the PSP and gain control of Victim 3's X account.[13] CC-1 then reset the password and logged onto Victim 3's X Account. Once in control of the account, another coconspirator created a website designed to impersonate Victim 3's website and developed a smart contract used to drain NFTs from victims who interacted with the fake website.

82.    The coconspirators published posts to the X account containing phishing links. The posts invited followers to claim an airdropped "pass." "Passes" grant holders exclusive access to benefits and opportunities offered by Victim 3's online community. Archived and redacted copies of the unauthorized posts are depicted below:



---

[13] CC-1 variously said that REDMAN and CC-4 sent the emails to X.

31



83.     The phishing link directed individuals to a domain that closely resembled the

domain of Victim 3's legitimate website. Victim 3's legitimate website offers NFT memberships

and provides Victim 3's online community with education on cryptocurrency, NFTs and Web3

technology.

84.     Law enforcement obtained publicly available archived copies of the fraudulent

website and the official website from July 19, 2022. A review of the archived websites shows the

fraudulent website looked similar to the real site. The fraudulent site contained a button to claim

a "limited-time airdrop" instead of a button to "Read Our Whitepaper". The archived and

redacted copies of the websites are depicted below:

*Victim 3 Official Website*



*Victim 3 Fraud Website*



85.     According to victims and CC-1, once an individual clicked the "Claim" button on the fraudulent website, a pop-up appeared asking the individual to connect their cryptocurrency wallet and approve a transaction. Once the cryptocurrency wallet was connected, NFTs and digital assets were transferred from the victims' wallets to a cryptocurrency wallet operated by the perpetrators.

86.     On July 21, 2022, a post was published to a separate X account operated by Victim 3 indicating control of the compromised Victim 3 X account was regained following the compromise and unauthorized posts. Multiple victims replied to the post indicating that their NFTs were stolen after interacting with the malicious link.

87.     After receiving NFTs from victims' wallets, CC-1 quickly sold them for ETH before they could be reported stolen. CC-1 then transferred that ETH to the other coconspirators, including REDMAN. In total, the sale of NFTs stolen from victims of the Victim 3 X account compromise and phishing scam totals approximately $67,911.48 USD. According to CC-1, REDMAN received approximately $20,000 USD to $40,000 USD from the Victim 3 X account compromise and phishing scam.

88.     According to CC-1, CC-1, REDMAN and coconspirators attempted to compromise additional X accounts and execute phishing scams but were unsuccessful. On one occasion, CC-1, REDMAN, and conspirators successfully compromised another X Account, but the phishing post was taken down within minutes. Even in the short time the post was active, however, the coconspirators stole NFTs valued at approximately $1,000 USD. Other attempts to compromise X accounts also failed, often because the effort to gain access to the X account failed in the first instance.

89.     The following table summarizes the total loss amount resulting from the sale of NFTs stolen from victims of the five compromised X accounts and phishing schemes executed

34

by REDMAN and various coconspirators using the X Partner Support Panel from May 22, 2022, through July 19, 2022, totaling $794,263.80 USD.

| X ACCOUNT | LOSS AMOUNT |
|---|---|
| Victim 1 | $446,756.92 |
| Victim 2 | $126,944.67 |
| Victim 3 | $67,911.48 |
| Victim 4 | $24,210.04 |
| Victim 5 | $128,440.69 |
| TOTAL | $794,263.80 |

## V.    REDMAN'S LAUNDERING OF FUNDS DERIVED FROM THE FRAUD

90.    Conversations with CC-1, records from SWAPD and Stake,[14] and blockchain tracing reveal that REDMAN used virtual currency mixers and cryptocurrency gambling websites to launder proceeds of the criminal scheme.

91.    According to CC-1, REDMAN told CC-1 he used Tornado Cash to launder proceeds of the PSP sale and subsequent phishing scams so that it would be difficult to trace the funds. In my training and experience, I know Tornado Cash is a cryptocurrency mixer that operates on the Ethereum blockchain and indiscriminately facilitates anonymous transactions by obfuscating their origin, destination, and counterparties, with no attempt to determine their origin. On August 8, 2022, (after REDMAN's use of the service) the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) sanctioned Tornado Cash because (among other reasons) it has been used to launder more than $7 billion worth of virtual currency. Prior to being sanctioned, Tornado Cash operated on U.S. infrastructure, including using websites and servers in the United States.

---

[14] Stake is a popular online cryptocurrency gambling platform with a casino and sports book. Stake is unavailable in some countries, including the United States.

92.     As discussed above, CC-1 would sell the NFTs stolen from victims and then transfer the resulting ETH to coconspirators, including REDMAN.

93.     For example, blockchain analysis and CC-1 confirmed that NFTs stolen as a result of the Victim 4 compromise were transferred into an ETH wallet beginning 0x81f ("Victim 4 Fraud Wallet"). From there, CC-1 transferred approximately 14.678 ETH from the Victim 4 Fraud Wallet to ETH address 0xe9fc ("Wallet 1"). On or about June 27, 2022, at REDMAN's direction, CC-1 used Wallet 1 to send two transactions totaling approximately 10.898 ETH ($13,121 USD) to 0xf730a ("Redman Consolidation Wallet").

94.     When CC-1 purchased the PSP access from REDMAN, REDMAN directed the funds be sent to 0x0214e ("Redman Wallet 1"). On June 27, 2022, REDMAN transferred those funds from the Redman Wallet 1 to the Redman Consolidation Wallet, further confirming that REDMAN controlled the Redman Consolidation Wallet.

95.     On or about June 27, 2022, REDMAN sent 12 transactions totaling 246 ETH ($293,312) from the Redman Consolidation Wallet to Tornado Cash. In my training and experience, I know Tornado Cash's smart contracts were written such that all virtual currency sent to Tornado Cash needed to be sent in predetermined ETH amounts of 100, 10, 1, or .1. Thus, on June 27, 2022, the Redman Consolidation Wallet sent ETH through Tornado Cash in two 100 ETH transactions, four 10 ETH transactions, and six 1 ETH transactions.

96.     After the ETH was funneled into Tornado Cash on June 27, 2022, blockchain tracing shows funds from the Redman Consolidation Wallet were withdrawn out of Tornado Cash and transferred to ETH address 0x2282 ("Post-Tornado Cash Wallet") on or about June 29 and June 30, 2022. These transactions to the Post-Tornado Cash Wallet is traceable via commercial blockchain tracing tools due to the amounts, structuring, and timing. For instance, the 12 ETH transactions sent into Tornado Cash on June 27, 2022, aligned with 11 ETH

36

withdrawals from Tornado Cash on June 29, 2022, and June 30, 2022. Specifically, the Post-Tornado Cash Wallet received 11 transactions from Tornado Cash totaling approximately 245 ETH in matching increments of two 100 ETH and four 10 ETH, and five 1 ETH transactions.[15]

97.     Similarly, blockchain analysis and CC-1 confirmed that NFTs stolen as a result of the Victim 2 compromise were transferred into wallet beginning 0x2100a ("Victim 2 Fraud Wallet"), controlled by CC-1. CC-1 then sent four transactions from the Victim 2 Fraud Wallet totaling approximately 95.141 ETH ($116,175 USD) to 0x5f23 ("Wallet 2") between July 15, 2022, and July 16, 2022. On July 16, 2022, at REDMAN's direction, CC-2 sent approximately 24.636 ETH ($33,323 USD) from Wallet 2 to 0x14313 ("Redman Wallet 2") as REDMAN's cut of the Victim 2 X compromise and phishing scam. On July 16, 2022, Redman Wallet 2 sent three transactions totaling approximately 30.096 ETH ($40,708 USD) to 0x775ee ("Redman Wallet 3"). On July 16, 2022, Redman Wallet 3 then sent three transactions of 10 ETH each to Tornado Cash.

## VI.    ATTRIBUTION

### a.  Antihero SWAPD Post

98.     On or about July 1, 2022, shortly after the sale of access to the PSP to CC-1, REDMAN, using the username "antihero," published a post ("Antihero SWAPD Post") on the website www.swapd.co[16] ("SWAPD"). This post advertised the opportunity to "lease out access to my exclusive Twitter panel." This post advertises access to the PSP. According to the Antihero SWAPD Post, access to the "Secret Twitter Panel" would grant a user the ability to

---

[15] Tornado Cash charges a fee for the use of its services. The approximately 1 ETH discrepancy between deposits into Tornado Cash and withdrawals to the Post-Tornado Cash Wallet is likely due to fees associated with the transactions.

[16] Swapd.co is described on its website as "a social media support services, marketplace and community."

"request usernames, ban accounts, restore access to stolen/locked accounts, report instances of

rule violations, and more"—all functions of the PSP. The Antihero SWAPD Post also listed price

tiers for varying durations of the lease, including a lifetime lease priced at $300,000 USD—

approximately the same amount that REDMAN had sold lifetime access to CC-1 for. A redacted

screenshot of the Antihero SWAPD Post is provided below:

 

99.     I know REDMAN posted the Antihero SWAPD Post based on records provided

by SWAPD and information provided by CC-1 and CC-2. According to CC-1 and CC-2,

REDMAN primarily used the alias "antihero" on social media platforms including X and

Instagram. Both CC-1 and CC-2 saw the Antihero SWAPD Post shortly after CC-1 purchased

the lease from REDMAN. CC-1 confirmed to FBI that the activity advertised in the Antihero

SWAPD Post accurately described the PSP access REDMAN sold to CC-1.

100.    Additionally, on or about December 23, 2023, SWAPD provided records to the

FBI confirming that the Antihero SWAPD Account published the Antihero SWAPD post and is

registered to REDMAN. SWAPD provided account identifiers for the Antihero SWAPD

Account that included REDMAN's full name and known phone number and address.

101.    According to SWAPD, the user of the Antihero SWAPD Account initially provided false verification using another individual's identification, which SWAPD subsequently identified as fraudulent. The user of the Antihero SWAPD Account subsequently submitted documents with REDMAN's identity, including photo identification. SWAPD provided FBI the identification documents uploaded to the Antihero SWAPD Account including the fraudulent identification and Ontario Photo and Health Cards for "CAMERON ALBERT REDMAN." Further, SWAPD provided the FBI with photographs of REDMAN, to include REDMAN's face and upper body (a selfie), holding up his photo identification cards, as required by SWAPD's authentication processes. Accordingly, investigators believe REDMAN is the user of the Antihero SWAPD Account, advertised the sale of unauthorized access to X accounts, and knowingly used the identification documents of another individual to bypass SWAPD verification and identification processes.

102.    The SWAPD records also showed all cryptocurrency payment addresses REDMAN used on the Antihero SWAPD Account. A review of the records provided by SWAPD shows the Post-Tornado Cash Wallet is one of the addresses REDMAN used on the Antihero SWAPD Account.

**b. Funds Sent to Cryptocurrency Gambling Service**

103.    As previously discussed, REDMAN had transferred approximately 243 ETH into the Post-Tornado Cash Wallet on June 29 and 30, 2022. On July 25, 2022, he transferred approximately 57.65 ETH ($87,751 USD) from the Post-Tornado Cash Wallet to wallet 0x965 ("0x965 Wallet"). In the 0x965 Wallet, the funds from the Post-Tornado Cash Wallet were comingled with funds from other sources. Just minutes later, approximately 88.012 ETH ($133,965 USD) was transferred from the 0x965 Wallet to wallet 0xb17d, where the funds sat dormant for approximately one month. Then, on or about August 25, 2022, approximately 58.69

ETH ($99,833 USD) was transferred from wallet 0xb17d to wallet 0x2ef2. From October 6, 2022, to October 9, 2022, wallet 0x2ef2 sent 15 transactions to 0x99eb79 ("Redman Stake Address"), a deposit address at Stake. The flow of funds from the Post-Tornado Cash Wallet to the Redman Stake Address is depicted below:



104.    A review of records provided by Stake to the FBI shows REDMAN is the owner of the Redman Stake Address. The records from Stake show the account using the Redman Stake Address is registered in REDMAN's name (using his middle name), as well as his date of birth and known address. The account using the Redman Stake address also uploaded a picture of REDMAN's Ontario driver's license.

105.    The following image depicts the general flow of funds from proceeds of REDMAN's sale of access to the PSP and phishing scams through Tornado Cash and then into the REDMAN Stake Account:



## **CONCLUSION**

106.     Based on the information detailed above, I believe there is probable cause to

charge REDMAN with: two counts of conspiracy to commit wire fraud, in violation of 18 U.S.C.

§ 1349; one count of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; one count of

aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2; and one count of

conspiracy to commit aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and

371.

Respectfully submitted,

*Jordan A Jenkins*
_____
Jordan Jenkins
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via
telephone this 17th day of April 2024.

_____
Honorable William B. Porter
United States Magistrate Judge